©2008 LAWYERS AGAINST LAWSUIT ABUSE.COM   402 West Broadway, Fourth Floor, San Diego, CA 92101   (619) 275-2000   Fax (619) 353-9990

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND BERRY,<br><br>　　　　　　Plaintiff,<br>v.<br><br>TIMBERLINE MOULDING; MARVIN WAIT, SUSAN WAIT; and Does 1 through 10, Inclusive,<br><br>　　　　　　Defendants. | CASE NO.: '08 CV 0352 BEN (CAB)<br><br>**DECLARATION OF PHILIPPE HELLER IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FRCP 12(B)(1) AND 12(B)(6)**<br><br>Judge: The Honorable Roger T. Benitez<br>Complaint Filed: 22 February 2008 |

I, Philippe Heller, do hereby declare as follows:

1.　I have firsthand, personal knowledge of the facts set forth in this declaration, and if called upon to do so, would and could testify competently thereto.

2.　I am a principal officer of ADA Compliance Review Corp (ADAComplianceReview.com) and have inspected over 200 commercial properties for a range of conditions over the past 5 years, including, without limitation, access for people with

-1-

disabilities.

3. On 25 and 26 March 2008, I personally reviewed the business known as Timberline Moulding and the surrounding property generally located at or about 1315 Armorlite Drive, in San Marcos, CA (the "Property"). The purpose of my visit was to ascertain whether conditions existed at the Property which would justify an order of this Court for changes to meet applicable standards for access for people with disabilities. My conclusion is that there are no such conditions exist for the following reasons:

    a. **Overview**: The public areas of this business are very small; the entire showroom area appears to be less than 1,000 square feet. I am of the opinion that there are a finite number of disabled access considerations which apply in such a small, commercial environment and that they can be established and evaluated with certainty.

    b. **Parking**: The first thing I normally consider at most properties is whether an appropriately-configured parking area is provided for access by people with disabilities; I concluded that it is at the Property for the following reasons:

        i. **Slope**: I measured the slope of the "Disabled Parking Area" (including the adjacent access aisle) and found it to be less than 2% in any direction. I found the surface of the Disabled Parking Area to be sufficiently smooth and even.

-2-

Raymond Berry, v. Timberline Moulding, et al., USDC, Case No. 08 CV 0352 BEN (CAB)
Dec of Philippe Heller iso MOTION TO DISMISS PER FRCP 12(B)(1)

©2008 LAWYERS AGAINST LAWSUIT ABUSE.COM   402 West Broadway, Fourth Floor, San Diego, CA 92101  (619) 275-2000  Fax (619) 353-9990

ii. **Parking Space Dimensions**: I understand that a disabled parking space should be 9 feet wide, between the painted lines, and I measured the space in question to confirm that it was. I further understand that such a space should be 18 feet long, and confirmed that it was. I further understand that the leading edge of any wheelstop(s) should not protrude more than 24" into the space and confirmed that this was the case. I further understand that the International Symbol of Accessibility should be painted at the rear of the space, outlined in white and at least 50 x 53"; in each case, I confirmed that these conditions were satisfied at the Property.

iii. **Number of spaces**: Because I understand that if a property has fewer than 25 parking spaces, only a single disabled parking space is required, which should be "van accessible" as discussed below, I counted the number of parking spaces and concluded that there were 14, and further concluded that the Disabled Parking Space was "van accessible" and met all applicable requirements.

iv. **Access Aisle**: I confirmed that the access aisle, which is immediately adjacent to the Disabled Parking Space, was at least 8 feet wide between the lines. I confirmed that it was diagonally striped consistent with applicable requirements and that the words "NO PARKING" were painted in white 12" high letters inside the space nearest the vehicular path.

-3-

Raymond Berry, v. Timberline Moulding, et al., USDC, Case No. 08 CV 0352 BEN (CAB)
Dec of Philippe Heller iso MOTION TO DISMISS PER FRCP 12(B)(1)

    v. **Signage**: I observed that an CMUTCD R-99 sign [i.e., the basic disabled parking sign] was properly posted, together with and CMUTCD R7-8b "van accessible" sign. I also observed a sign which indicated "$250 fine" and understand that the property owner will be replacing such sign with one in the form approved by the CMUTCD as soon as it approves such form, which is expected prior to the posting requirement 1 July 2008' because this sign is not yet required, I do not consider the sign under these circumstances to be inappropriate, especially when considered with the owner's commitment to post a sign in the form approved by the CMUTCD prior to the date such posting is required. I observed at least one CMUTCD R-100b sign conspicuously posted at the sole entrance to the parking area and measured to ensure that the base of the sign was at least 80" above the finish surface; I further observed that the sign had the address and telephone number of the towing agency printed in at least 1" letters.

  c. **Exterior Paths of Travel**: Because the access aisle in the Disabled Parking Area is immediately adjacent to the front door of the business, and because I understand that the front doors of the business are customarily secured in the open position during business hours, I first considered the path someone who parked in the Disabled Parking Area would take to reach the front door of the business and concluded that it was sufficiently smooth and level to present no impediment to disabled access. I next considered the demarcated path of

-4-

travel from the public way to the front door (i.e., since this business is in an industrial area, there is no sidewalk).  The property falls under the exemption of The Unusual Characteristics Test #3 which holds that: An accessible route to a building entrance is impractical due to unusual characteristics of the site when:

　　i. The original site characteristics result in a difference in finished grade elevation exceeding 30 inches and 10 percent measured between an entrance and all vehicular or pedestrian arrival points within 50 feet of the planned entrance; or

　　ii. If there are no vehicular or pedestrian arrival points within 50 feet of the planned entrance, the unusual characteristics result in a difference in finished grade elevation exceeding 30 inches and 10 percent measured between an entrance and the closest vehicular or pedestrian arrival point.

d. As a result, it is my conclusion that the paths of travel for disabled access in the exterior areas of the Property meet all applicable standards for access for people with disabilities.

e. **Entrance**:  I concluded that the sole public entrance meet all applicable disabled access standards for the following reasons:

　　i. **Clearance**: As I understand it, the double doors which comprise the sole public entrance to the public areas of the business are required to remain open during business hours; because I observed significantly in excess of 36" clearance width when they are open, I conclude that there is

-5-

Raymond Berry, v. Timberline Moulding, et al., USDC, Case No. 08 CV 0352 BEN (CAB)
Dec of Philippe Heller iso MOTION TO DISMISS PER FRCP 12(B)(1)

sufficient width.

ii. **Threshold**: No threshold is installed at the entrance. It is flush. I concluded that this meets applicable disabled access standards.

iii. **Hardware**: Even though I understand that the doors at the sole public entrance are customarily left open, I reviewed the hardware to ensure that it would be compliant in emergency circumstances or inclement weather.

iv. **Signage**: I observed appropriate signage posted confirming that the entrance is accessible to people with disabilities.

v. **Overall**: Altogether, I believe the foregoing are the relevant disabled access requirements for the entrance and that the entrance at the Property meets them.

f. **Showroom**: I concluded that the showroom area (at least all portions of which that are accessible to the public) complied with all applicable disabled access standards for the following reasons:

i. **Aisle clearance**: I observed at least 36" of clearance in all aisles.

ii. **Product display**: Although I observed products displayed over 40" from

-6-

Raymond Berry, v. Timberline Moulding, et al., USDC, Case No. 08 CV 0352 BEN (CAB)
Dec of Philippe Heller iso MOTION TO DISMISS PER FRCP 12(B)(1)

the floor (which is acceptable if assistance is available), I noticed a number of signs posted with wheelchair symbols offering assistance.

   iii. **Service counter**: I observed a customer service counter with an area approximately 36 inches wide by no less than 24 inches deep lowered to less than 34" high, with 19" forward and 27" vertical leg clearance. I consider the accessible counter mentioned to meet all applicable standards for access by people with disabilities.

   iv. In the showroom, I did not observe any protruding objects or other potential impediments for disabled access, and therefore based on the foregoing, I concluded that the showroom area currently meets all applicable standards for disabled access.

g. **Restroom**: Although there are over 100 measurements which can be relevant in evaluating compliance in restrooms, for brevity I consider the following to be the most significant in my conclusion that the restroom area meets all applicable standards for disabled access:

   i. **60" turning radius**: One of the most common problems in restrooms in older buildings is the lack of at least a 60" maneuvering radius, I observed a clear area in excess of that in this restroom.

   ii. **Mirror/dispenser/fixture height and location:** The highest operative

-7-

Raymond Berry, v. Timberline Moulding, et al., USDC, Case No. 08 CV 0352 BEN (CAB)
Dec of Philippe Heller iso MOTION TO DISMISS PER FRCP 12(B)(1)

©2008 LAWYERS AGAINST LAWSUIT ABUSE.COM   402 West Broadway, Fourth Floor, San Diego, CA 92101   (619) 275-2000   Fax (619) 353-9990

parts of all fixtures, as well as the lowest reflective portion of the mirror, was less than 40" from the floor

    iii. **Sink fixtures**: I confirmed that the faucet handles could be operated without pinching, twisting or grasping and that the pipes beneath the sink were wrapped.

    iv. **Toilet dimensions**:

    v. **Signs**: I confirmed that appropriate signs are appropriately posted on both the wall adjacent to the latch side of the restroom door, as well as the door itself.

    vi. **Door hardware**: I observed that the door hardware was mounted a the appropriate height and required no pinching, twisting or grasping to operate. I confirmed that the door takes less than 5 pounds of force to open.

h. In light of the foregoing criteria and observations, as well as other considerations too numerous to list, I concluded that the restroom is accessible to persons with disabilities.

4. I have reviewed the complaint in the above-encaptioned matter and have visited the Subject Property (i.e., the "Sushi Solana" restaurant at 117 West Plaza Street in Solana

Beach, CA) and believe it generally meets the "readily achievable" standard of the ADA, which I believe is the standard applicable to this property.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on 3 January 2007, at San Diego, California.

*Philippe Heller*

Philippe Heller
ADA Compliance Review Corp.

-- *BY FACSIMILE* --

Raymond Berry, v. Timberline Moulding, et al., USDC, Case No. 08 CV 0352 BEN (CAB)
Dec of Philippe Heller iso MOTION TO DISMISS PER FRCP 12(B)(1)